[Cite as *State v. Dillon*, 2017-Ohio-827.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| --- | --- | --- |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27860 |
| --- | --- |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| EDWIN R. DILLON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2015 02 0327 |

DECISION AND JOURNAL ENTRY

Dated: March 8, 2017

CARR, Presiding Judge.

{¶1}  Appellant Edwin Dillon appeals his conviction from the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}  After an altercation, Dillon was indicted on one count of felonious assault.  Dillon waived his right to a jury trial, and the case was tried by the bench.  The trial court judge found Dillon guilty and sentenced him to three years in prison.  Dillon appealed and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶3}  Dillon argues that his conviction is against the manifest weight of the evidence. This Court disagrees.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

> Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Further when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. *Id*.

*State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5.

{¶4} This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387.

{¶5} This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witnesses' testimony over the testimony of others. *State v. Crowe*, 9th Dist. Medina No. 04CA0098-M, 2005-Ohio-4082, ¶ 22.

{¶6} Dillon was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."

{¶7} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A

"[d]eadly weapon" includes "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶8} The evidence adduced at trial indicated the following. The victim brought a 12-pack of beer to his friend John's house around noon on a Friday afternoon in January 2015. The two men intended to spend the day drinking and listening to music. Approximately 45 minutes later, the victim's sometimes-estranged wife arrived. She knew by her husband's demeanor that he had drunk more than six beers, as he had become belligerent. The two argued over the loud music playing in the living room.

{¶9} In the meantime, Dillon and his friend Jeff were upstairs in the room they rented from John, packing and preparing to move to another apartment. Hearing the victim loudly yelling at his wife, Dillon walked downstairs and confronted the victim, cautioning him not to be so loud. The victim was disrespectful in response, and their argument escalated. Dillon pulled out a pocket knife with the blade extended and held it at his side. Dillon remained verbally aggressive; and the victim, feeling threatened, attempted to disarm him. The two men wrestled their way across the living room into the kitchen. As the victim grabbed for the knife, Dillon lunged toward him.

{¶10} The victim's wife called out for help, and Jeff forced his way in between Dillon and the victim, holding the hand in which Dillon held the knife. The two men continued to try to reach one another, fighting around Jeff who was trying to separate them. As Jeff held up Dillon's hand holding the knife, Dillon switched the knife to his other hand and continued to make stabbing lunges toward the victim. At some point during the struggle, the victim sustained a slash on his finger and a scratch on his neck.

{¶11} Jeff was ultimately able to separate the two men. Dillon ran out one door toward the deck leading to a yard and eventually a roadway. In the three-foot deep snow in the yard, the police saw footprints that ended in the cleared roadway. The victim ran out another door to the main road and called the police. Once outside, the victim realized he had been cut. Droplets of blood were found in the kitchen and on the door jamb. The victim later received four stitches in his finger to close the wound.

{¶12} Jeff left the house in John's car, found Dillon on the roadway, and drove him to a friend's house for the night. Accordingly, the police were not able to question Jeff or Dillon immediately after the incident. The police were able to question John, the victim, and the victim's wife, however, at the scene. All three indicated that Dillon had a pocket knife in his hand and that the victim sustained a cut. Based on information obtained, the police obtained a warrant for Dillon's arrest; and he was arrested as he tried to return to John's house the next day.

{¶13} Dillon made numerous calls from the jail to various people. He admitted having his pocket knife out as he confronted the victim. He maintained an attitude that he would not tolerate disrespect from others and that the victim should have left when Dillon told him to go. He told one listener that the victim had acted like he was going to slap Dillon in the face, "and guess what, his hand got stuck." He admitted that he was "pretty well buzzed up" at John's because he had earlier used some substance that puts him in the "mode" and makes him paranoid. He lamented his use of a knife and made repeated promises to one woman that he would stop carrying a knife, although he would carry tear gas so he would not be "totally naked." The prominent theme of Dillon's jail calls, however, was his emphatic instructions to his listeners to get messages to John, the victim, and the victim's wife to dissuade them from testifying before the Grand Jury or at any trial. Dillon asserted that those three witnesses needed

to stay away from the police, prosecutor, and Grand Jury, or else he would inflict significant physical harm on them when he was released from prison. He even discussed calling "the brothers," who appeared to be associated with a motorcycle gang, and who would "make sure someone doesn't continue to breathe," if he or she testifies before the Grand Jury.

{¶14} A thorough review of the record indicates that this is not the exceptional case where the evidence weighs heavily in favor of Dillon. The weight of the evidence supports the conclusion that Dillon knowingly caused and attempted to cause physical harm to the victim by means of a deadly weapon. Dillon often carried a pocket knife and was prepared to use it against other people. He was, therefore, aware of the harm he could inflict with his knife. He verbally confronted the victim and then pulled out his knife when the victim did not politely yield to Dillon's self-professed authority. Dillon became more verbally aggressive and threatened the victim, while repeatedly lunging toward the victim with his knife. The altercation escalated. Even after another man wedged himself between Dillon and the victim, Dillon continued to jab around his friend to try to reach the victim. When his friend attempted to disarm him, Dillon switched his knife to his free hand and continued to lunge toward the victim. The victim sustained a knife wound to his finger requiring four stitches during the altercation. Accordingly, Dillon's conviction for felonious assault is not against the manifest weight of the evidence. His assignment of error is overruled.

III.

{¶15} Dillon's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

—

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.


APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.